## Taylor, Appellant, *v.* Woelpper & Crawford.

*Contracts—Alleged novation.*

Where a firm of stockbrokers is dissolved and a new firm assumes the payment of the debts of the old firm, and the new firm becomes insolvent and a receiver is appointed, the members of the former firm stand in the relation of surety to the creditors of the old firm, and they are not released from this liability because the creditors participate in a dividend in the receivership, as such participation is not a novation.

Argued Nov. 15, 1918. Appeal, No. 19, Oct. T., 1918, by plaintiff, from judgment of C. P. No. 4, Philadelphia County, June T., 1916, No. 1144, for defendants, in case tried by the court without a jury in suit of Agnes L. Taylor v. Wilson Woelpper & Alexander L. Crawford, formerly partners, trading under the firm name of Woelpper, Crawford & Co. Before ORLADY, P. J., PORTER, HENDERSON, TREXLER and WILLIAMS, JJ. Reversed.

Assumpsit on contract to deliver stock certificates. Before CARR, J., without a jury.

The facts are stated in the opinion of the Superior Court.

The court entered judgment in favor of the defendant. Plaintiff appealed.

*Errors assigned* were various findings of fact and conclusions of law and the judgment of the court.

*Walter C. Longstreth,* for appellant.—The defendants were sureties for the debts of the dissolved partnership: Campbell v. Floyd, 153 Pa. 84; Johnston v. Thompson, 4 Watts 446; Miller v. Stem, 2 Pa. 286; Brubaker v. Okeson, 36 Pa. 519; Peoples Bank v. Legrand, 103 Pa. 309.

There was no novation as the plaintiff never released the members of the retiring firm from liability: 29 Cyc. 1132; Equitable Trust Company v. Bowen, 201 Pa. 534; Willock v. The Oil Company, 184 Pa. 245.

*William Clarke Mason,* and with him *Harold B. Beitler,* for appellee.

OPINION BY WILLIAMS, J., May 8, 1919:

Defendants were stockbrokers. January 11, 1915, plaintiff paid defendants' firm $200 as the first payment on the purchase-price of $950 for ten shares of S. C. Electric Company stock, with five shares of common stock as a bonus; she was to pay the balance as she could; February 28th, Crawford retired from the firm; March 1st, a new firm composed of Woelpper, Wetherill and Morton, assumed the debts and obligations, and carried on the business; March 29th, the new firm went into the hands of a receiver; April 11th, plaintiff made a tender to the receiver of the balance due on the stock, but did not get it; April 16th, the receiver appraised the stock as worth only $50 a share for preferred, and $25 for common; claimed the dealings with plaintiff had been on margin; her margin was wiped out, and that she owed the insolvent firm, instead of having a claim against it; the auditor refused to sustain this position, and allowed plaintiff to claim as a creditor to the extent of her $200 claim on the understanding that the receiver would sell, and the plaintiff purchase the stock for $910, said plaintiff reserving all rights of recourse against the present defendants; May 15th, plaintiff paid $910 for the stock, and received it May 22d; later she received

dividends from the receiver on her claim in the sum of $86.66.

The court found the agreement to purchase the stock from the receiver was a novation, which released defendants from liability; that the stock could have been bought at the time of the tender for $625, the market price claimed by the receiver, hence, no damage was shown; that the receiver was willing to accept the tender and turn over the stock; and that acceptance of dividends from the assets of the insolvent firm was res adjudicata that plaintiff had released defendants.

The auditor's acceptance of plaintiff as a creditor to the extent of $200, confirmed by the court of common pleas, and unappealed from, is res adjudicata that plaintiff is entitled to recover back her $200, as for a disaffirmance of the contract. If the insolvent firm cannot pay, then defendants, who stand in the position of sureties, must make good: Campbell v. Floyd et al., 153 Pa. 84. HEYDRICK, J., says (94 et seq.): "If......plaintiff is precluded......from recovering........what is admitted to have been a debt owed......it must be on the theory that when he (defendant) retired from the partnership and the remaining partners assumed the debts thereof his relation, ipso facto, changed from that of principal debtor to that of surety for his late associates, or that the continuance of the deposit with the new firm and acceptance of interest from it with knowledge of the facts was a novation of the debt.......Assuming then the relation of this appellant to have become that of a surety, what is there in the facts alleged to discharge him? Mere forbearance, however prejudicial to the surety, will not release him......Nor will indulgence, accompanied by payment of interest by the debtor and a promise of punctuality in the future, have the effect if the creditors' hands are not tied......and while a surety may be discharged by an agreement between the creditor and the principal debtor......the essential elements of a contract must be present......so also may a

surety as well as a principal debtor be discharged by the intervention of a new debtor......but to make the novation complete not only must the third person become debtor in place of the former debtor as between himself and the former debtor, but he must be accepted by the creditor as such." The court proceeded to hold that the receipt of interest on the debt, and of dividends from the receiver of the bank, did not discharge the partner who had left the partnership.

Plaintiff was the only witness and there is no question of disputed testimony. Is there any evidence to sustain the court's findings? There is no evidence that plaintiff dealt with defendants on margin. She testified: "I was doing what they call buying on the installment plan. ......I had done that sort of thing with him before, and they had never made request for payment. I paid at my own convenience. They understood that, that it depended on my salary. I said I would come down and confirm the sale......I said I had decided to take the stock if they would be satisfied with an initial payment of $200. He said that would be all right, that is their usual terms. ......I never carried a margin account. When I bought the Lehigh Traction I gave them a bond as collateral. I didn't pay for them outright, but I never carried a marginal account......I said to Mr. Wetherill: 'Why don't you tell me something like this was going to happen, and I could have gone to the bank and borrowed the money and paid my balance. I am ready to do it now. If you will give me the stock certificates I will go across the street to the bank and bring back the money.' He says: 'It is too late, we are in the receiver's hands and it can't be done. You must write to the receiver.' And I said: 'If you will give me the block of stock.' Q. 'The certificates?' A. 'The block of certificates for 10 shares of preferred, which I was buying, and the bonus of five shares of common, I will immediately give you the balance of the money.'......I said: 'If you will turn over to me that stock certificate I am ready at any moment to

pay you the balance'......He said to me: 'The stock is now much cheaper than when you bought it, no doubt it would be a large loss.' I said: 'I don't care, I made a certain bargain with you which I am ready to keep. ......I am ready to carry out my contract with Woelpper & Crawford, or with Woelpper & Company, as it was then known, if you will give me the stock'......I simply said: 'Whenever you will let me have the stock I am ready to complete my contract and pay in full.' I saw him once in the spring. He would always promise me he would see what could be done, after consulting some people about it and talking. In August I saw him again and made the same offer, August, 1915, repeatedly. I think as much as four times I saw him personally, each time asking if I could not have the stock. In one case he said: 'It would be a great advantage to the firm if you could, because they would be getting much more out of the stock than they could again.' I said I didn't care for that: 'I will keep my contract if you will let me have the stock certificates.' They had depreciated the stock until it was selling at about 50, they said, although in New York it was still selling for 91, and they fixed my account on that arrangement......They were indebted to me for $200 that I had paid them in good faith, it was not a marginal account, and therefore, I ought to rank with the other creditors, whereas they were trying to make me out a debtor to the firm instead of a creditor. ......The auditor said the fair price, he had the testimony from the brokers at that time, that I ought to pay only the then market price, which was 91, and I then paid the full price of 91, $910 and accrued interest...... The firm of Woelpper & Crawford, or Woelpper & Company, never made any demand on me at any time to pay any money. I was to pay the balance at any time it suited me. They knew it was dependent on my salary, and they understood that"......The Court: "That relates only to accounts on margin?" Mr. Longstreth: "Yes." The Court: "This is not the transaction here. I

understood her to say it was not, that she was not buying on margin at all."

There is no evidence that plaintiff entered into a novation releasing defendants. The agreement between the auditor, the receiver, and the plaintiff was made May 8, 1916; and the report of the auditor, recommending a dividend of 33 1-3 per cent upon claims allowed, including plaintiff's claim in the sum of $200, was confirmed by the court of common pleas, No. 5, on June 27, 1916. On September 25, 1916, the same court, in the aforementioned receivership proceeding, made absolute a "Rule to allow Agnes L. Taylor to prosecute an action of assumpsit against Wilson Woelpper and Alexander L. Crawford, formerly partners, trading under the firm name of Woelpper, Crawford & Company." The above rule expressly designated this action of assumpsit in the court of common pleas, No. 4, the case at bar, by term and number. There is no evidence that the stock ever sold or had a market price other than $91, the price plaintiff paid the receiver for it, with the exception of the price of $95, set in the contract with defendants; or that the receiver was at any time willing to hand over the stock pursuant to the contract of defendants' firm with plaintiff.

The assignments relating to these conclusions of fact are sustained, the judgment reversed, and the record remitted to the court below with a procedendo.